## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JANA CANTREL,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL No. JKB-12-2607** |
| **UNITED STATES OF AMERICA** | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM

Jana Cantrel ("Plaintiff") brought this suit against the United States of America ("Defendant") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), *et seq.*, alleging negligence and intentional infliction of emotional distress ("IIED").  Now pending before the Court is Defendant's motion for summary judgment (ECF No. 55).  The issues have been briefed and no hearing is required.  Local Rule 105.6.  For the reasons set forth below, the motion will be granted in part and denied in part.

### I.      BACKGROUND[1]

In 2007, prior to the events at the heart of this case, Plaintiff was diagnosed with hepatitis C.[2] (ECF No. 59-2, Ex. A, "Plaintiff's Answers to Interr.", No. 4.)  After her diagnosis, Plaintiff underwent intensive interferon-based therapy treatment, which lasted until July 2008.[3]  (*Id.*)

---

[1] The facts and the inferences to be drawn therefrom are taken in the light most favorable to Plaintiff as the party opposing the motion for summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

[2] Hepatitis C is a virus that causes inflammation of, and in many cases damage to, the liver.  In the most serious cases, infected persons suffer cirrhosis (scarring) of the liver and can develop liver cancer or liver failure.  1 Richard M. Patterson, Lawyers' Medical Cyclopedia 7-94 to 7-95 (6th ed. 2014).

[3] "Interferon-alpha-based therapies are the mainstay of hepatitis C treatment."  *Id.*

On December 29, 2010, Plaintiff, who was feeling nauseous and experiencing abdominal pain, went to a Chase Brexton[4] facility in Columbia, Maryland, where she was examined by Dr. Santhia Mathew[5].  Dr. Mathew inquired about Plaintiff's previous medical history, and Plaintiff explained that she had been diagnosed with hepatitis C and had been treated by interferon-based therapy.  (Mathew Depo. at 16; ECF No. 59-3 at 3, 8; ECF No 59-6- Exhibit E, "Cantrel Aff.," at ¶ 3.)  Dr. Mathew then ordered blood work, including a hepatitis panel in light of Plaintiff's medical history. (Mathew Depo. at 16; ECF No. 59-3 at 8; Cantrel Aff. at ¶ 3.)[6]

On January 7, 2011, Plaintiff returned to Chase Brexton for a follow-up appointment. (Mathew Depo. at 27; ECF No. 59-3 at 11; Cantrel Aff. at ¶ 4.)  During this appointment, Dr. Mathew went through the results of some of Plaintiff's blood work with her. (Mathew Depo. at 27-32; ECF No. 59-3 at 14; Cantrel Aff. at ¶ 4.)  In particular, the tests showed that Plaintiff had elevated "ALT" liver enzymes.[7]  (Mathew Depo. at 28; ECF no. 59-3 at 14.)  Such a result "could be from just normal fluctuations within the body itself. It could be from injury to the liver, through toxins, alcohol, medications, infection.  Could be any of those." (Mathew Depo. at 28.)  The ALT level can also be affected by a high level of the hepatitis C virus within the body though elevated ALT is not indicative of an "elevated viral load."  (*Id.* at 53.)  Thus, Dr. Mathew's opinion, upon reviewing the lab work was that "[Plaintiff] had an elevated ALT and we were still waiting for the rest of her lab work." (Mathew Depo. at 30.)  Dr. Mathew also

---

[4] Chase Brexton Health Services, Inc. is a federally-qualified community health center with several facilities in the Baltimore metropolitan area.  (ECF Nos. 59-1 at 4; 55-1 at 2.)

[5] Dr. Mathew is a licensed physician who is board certified in family medicine. (ECF No. 55-2m, Ex. 1, "Mathew Depo." at 7-8.)  She is a staff physician at Chase Brexton.  (*Id.* at 5.)

[6] Dr. Mathew has stated that she believes she referred Defendant to an infectious diseases specialist during the December 29, 2010 visit.  (Mathew Depo. at 21.)  However, no such referral is noted in her office visit notes.  (ECF No. 59-3 at 8.)  Further, later in her deposition, Dr. Mathew notes that she did not refer Plaintiff to an infectious diseases specialist during the December 29 visit.  (Mathew Depo. at 42.)

[7] The results of the ALT test are not part of  Plaintiff's medical records.  (Mathew Depo. at 29, 35-36.)  Dr. Mathew has explained that sometimes test results are viewable through an online database before the hard copy of the results are received.  (*Id.*)  However, this result was noted on Dr. Mathew's office visit notes.  (ECF No. 59-3 at 14.)

referred Plaintiff to an infectious diseases specialist "[b]ecause of her history of hepatitis C and because of her concerns for hepatitis C and her questions.  [Dr. Mathew] wanted her to see the infectious diseases specialist for her answers." (Mathew Depo. at 27-33; ECF No. 59-3 at 14; Cantrel Aff. at ¶ 4.)

In addition to these undisputed facts about the January 7 visit, Plaintiff has testified that Dr. Mathew also informed her that "based upon the blood work results [Plaintiff] would need to go back on Interferon for reoccurrence of hepatitis C." (Cantrel Aff. ¶ 4.)  She has further provided that Dr. Mathew told her she was "going to die." (*Id.*)  Defendant denies (1) telling Plaintiff she was going to die; (2) telling her she had a recurrence of hepatitis C; and (3) telling her she needed to go back on interferon treatment. (Mathew Depo. at 37.)

On January 21, 2011, Plaintiff had a third appointment with Dr. Mathew.  (Mathew Depo. at 40; ECF No. 59-3 at 16; Cantrel Aff. at ¶ 6.)  During this visit, Dr. Mathew told Plaintiff that her continuing abdominal pain might be caused by hepatitis C.  (Mathew Depo. at 27-32; ECF No. 59-3 at 22; Cantrel Aff. at ¶ 6.)  According to Plaintiff, Dr. Mathew told her that the pain "*was* due to hepatitis C." (Cantrel Aff. at ¶ 6 (emphasis added).)  Dr. Mathew, for her part, recalls that she told Plaintiff that it was *possible* but *unlikely* that her abdominal pain was caused by a hepatitis C infection.  (Mathew Depo. at 38, 40; ECF No. 59-6 at 22 ("Abdominal pain may be caused by Hep C Infection.").)  Dr. Mathew also assessed Plaintiff's mental status and found that she had an increased risk of depression.  (Mathew Depo. at 49.)  Dr. Mathew further found that Plaintiff's depression was associated with her concerns that she had a reoccurrence of hepatitis C.  (*Id.* at 44, 45.)

On January 28, 2011, Plaintiff saw Tonia Poteat, who, at the time, worked as a physician assistant in Chase Brexton's Baltimore facility and specialized in the treatment of patients with

HIV and hepatitis C.[8]  (ECF No. 55-3, Ex. 2, "Poteat Depo." at 7.)  Plaintiff "complained of pain in her liver . . . and stated that she was worried that her hepatitis C had come back."  (*Id.* 11; *see also* ECF No. 55-7, Ex. 6, "Cantrel Depo." at 47.)  In particular, Plaintiff explained that she had seen "hard copies of blood work that indicated an elevated viral load as well as elevated liver enzymes" (Poteat Depo. at 11), that Dr. Mathew had told her that her hepatitis C was back, and that she was meeting with Ms. Poteat to discuss treatment options (Cantrel Depo at 47).

Ms. Poteat consulted Plaintiff's medical record and, based on the results from the tests ordered by Dr. Mathew, "came to the conclusion that [Plaintiff] had been exposed to [h]epatitis C in the past based on her antibody test results and that she did not currently have [h]epatitis C based on her viral load and genotype results."  (Poteat Depo. at 15, Cantrel Depo. 47-48.)  One of the tests results, however, the ALT test, was not listed in Plaintiff's medical record.[9]  (Poteat Depo. at 37.)  At her deposition, Ms. Poteat reviewed the results of this ALT test and concluded that it was indicative of "some liver inflammation" but had "very little" to do with a recurrence of hepatitis C.  (*Id.* at 38.)  In particular, she explained that "[t]here are many things that can cause inflammation of the liver, especially at that low level.  It could be something as simple as a glass of wine the night before having your blood drawn or it could be a multitude of other things."  (*Id.*)

Plaintiff was very surprised by Ms. Poteat's diagnosis.  (Poteat Depo. at 52; Cantrel Depo. at 47-48.)  She insisted that "she had seen hard copies of lab results" and that it was possible that Ms. Poteat simply hadn't seen these test results.  (Poteat Depo. at 52.)  As a result, Ms. Poteat called Dr. Mathew.  (Poteat Depo. at 52-54; Cantrel Depo. at 12.)  Ms. Poteat stepped out to

---

[8] Ms. Poteat obtained a master's in medical science from Emory University in 1995 and completed a year-long fellowship at the University of Missouri Kansas City in 2001.  (Poteat Depo. at 6.)
[9] Ms. Poteat has offered that there are a number of benign reasons for the absence of these test results from Plaintiff's medical records.  (Poteat Depo. at 37; *see also* supra at note 7.)

make the phone call. (Poteat Depo. at 52-54.)  She asked Dr. Mathew if there were hard copies of any test results that were not part of Plaintiff's medical record and was told that there were not. (*Id.*)[10]

Plaintiff has testified that she is "99 percent sure" that when Ms. Poteat came back into her office, after the phone call, she told Plaintiff that "Dr. Mathew just said, oops, I must have read the blood wrong." (Cantrel Depo. at 48.)  For her part, Ms. Poteat has explained that she is "99 percent sure that Dr. Mathew did not" make any such statement. (Poteat Depo. at 59.)

Ms. Poteat ordered some additional blood work for Plaintiff. (Poteat Depo. at 33.)  She explained that she did so because Plaintiff seemed so concerned about the pain in her liver and the possibility that she might have a reoccurrence of hepatitis C.  (*Id.*)  Based on the results of these tests, Ms. Poteat was able to confirm her diagnosis that Plaintiff did not have a reoccurrence of hepatitis C.[11]  (*Id.*  at 33-36.)

With regard to standards of care, in her deposition testimony, Dr. Mathew explained that it would be "wrong" and "bad medicine" to tell a patient they have hepatitis C, or a reoccurrence of hepatitis C, before an infectious diseases doctor has had the opportunity to review all the relevant lab results.   (Mathew Depo. at 41-42, 47-48.)  Indeed, Dr. Mathew has no experience treating or diagnosing hepatitis C and would therefore need to consult with a specialized physician to diagnose or treat the infection.   (*Id.* at 17, 21, 65.)  Ms. Poteat also provided that if a patient with a history of hepatitis might have a reoccurrence of the infection, the normal procedure for a family medicine physician, such as Dr. Mathew, would be to order hepatitis C antibody testing and viral load testing and refer the patient to a specialist. (Poteat Depo. at 60-61.)  The specialist would then interpret the results of the blood test and diagnose the patient.  (*Id.*)

---

[10] Ms. Poteat does not recall discussing Plaintiff's ALT test with Dr. Mathew.  (Poteat Depo. at 53-54.)
[11] As part of these new tests, Ms. Poteat ordered an ALT test, which came back normal.  (Poteat Depo. at 35.)  In addition, an AST test, which is another liver enzyme test, came back normal.  (*Id.*)

After her second appointment with Dr. Mathew, on January 7, 2011, Plaintiff applied for a life insurance policy from State Farm. (Cantrel Aff. ¶ 9; ECF No. 55-8, Ex. 7, "Duffy Aff.") Plaintiff has testified that she told Paul Duffy, the State Farm insurance agent, that she was applying for life insurance because she "had just been re-diagnosed with hepatitis C and that it was essentially a death sentence." (Cantrel Depo. at 27.) For his part, Mr. Duffy has reported that he does not recall Plaintiff "saying anything about having been told that her hepatitis C had been diagnosed as having recurred." (Duffy Aff.) He has further provided that *had* she made such a statement he would have contacted the company's underwriters immediately. (*Id.*) Mr. Duffy has declared that he did not contact the underwriters regarding Plaintiff's application. (*Id.*) In addition, as part of the standard application process for a life insurance policy, Mr. Duffy presented Plaintiff with a "form Authorization to Release Medical Records," which she signed. (*Id.*; Cantrel Depo. at 30; ECF No. 55-9.)

Rebecca Ring, an underwriter at State Farm, reviewed Plaintiff's life insurance application and made the final decision not to offer her a policy. (ECF No. 55-11, Ex. 10, "Ring Depo." at 8; ECF No. 55-12.) In her letter to Plaintiff explaining the decision, Ms. Ring noted that the denial was due to "hepatitis and mental or nervous disorder as indicated in the underwriting interview and Attending Physician's Statement from Dr. Samthia Mathew." (ECF No. 55-12.) In her deposition testimony, Ms. Ring explained that her decision was based on her review of an extended phone interview with Plaintiff[12], which took place on January 12, 2011, and Plaintiff's medical records from Chase Brexton. (Ring Depo. at 9.) Ms. Ring further specified that in the insurance business, "an attending physician statement refers to the medical records." (*Id.* at 22.)

---

[12] This interview was recorded, and an audio copy was provided to the Court. (ECF No. 55-10.)

In considering an application for life insurance, State Farm's guidelines provide that a "[h]istory of hepatitis C with abnormal liver function enzymes," even without a reoccurrence of hepatitis C, is cause for denial. (*Id.* at 26.) Further, a history of depression with poor control is also cause for a denial. (*Id.* at 26-27.)

In her January 12, 2011 interview, Plaintiff provided that she had a history of depression and anxiety with poor control. (Ring Depo. at 23; ECF No. 55-9 at 12.) Further, Plaintiff referred to her history of hepatitis C with abnormal liver functions. (Ring Depo. at 23; ECF No. 55-9 at 9.) Ms. Ring provided that Plaintiff's medical records corroborated Plaintiff's history of hepatitis C, based on the results of the 2007 liver biopsy. (Ring Depo. at 23.) Plaintiff's medical records also showed abnormal liver enzymes in 2011. (*Id.*) Ms. Ring testified that these two factors (i.e., (1) Plaintiff's history of depression with poor control and (2) Plaintiff's history of hepatitis C in 2007 and abnormal liver enzymes in 2011) were the basis for her decision to deny Plaintiff's application. (*Id.*)

On August 30, 2012, Plaintiff filed the present action seeking monetary damages for negligence and IIED, pursuant to the FTCA, 28 U.S.C. §§ 1346(b), *et seq.* (ECF No. 1.) Defendant filed a motion to dismiss on December 21, 2012. (ECF no. 8.) This motion was denied by the Court on March 5, 2013. (ECF No. 22.) With leave of Court, Plaintiff then filed an amended complaint. (ECF No. 23.) On March 26, 2014, Defendant filed the present motion for summary judgment. (ECF No. 55.)

## II.   LEGAL STANDARD

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a party carries this burden, then the court will award summary judgment unless the opposing party

can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine

issue for trial.  Fed. R. Civ. P. 56(e)(2).  To carry these respective burdens, each party must

support its assertions by citing specific evidence from the record.  Fed. R. Civ. P. 56(c)(1)(A).

The court will assess the merits of the motion, and any responses, viewing all facts and

reasonable inferences in the light most favorable to the opposing party.  *Scott v. Harris*, 550 U.S.

372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

### III.   ANALYSIS

#### a.  Count I (Negligence)

Under Maryland law, the elements of a cause of action in negligence are: "(1) that the

defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached

that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury

proximately resulted from the defendant's breach of duty."  *State v. Copes*, 927 A.2d 426, 437

(Md. App. 2007) (quoting *Chicago Title Ins. Co. v. Allfirst Bank*, 905 A.2d 366, 378 (Md.

2006)).  Where, as here, the cause of action arises in the context of medical malpractice, these

elements "translate into a duty of care owed by the health care provider to the patient; a breach of

the applicable standard of care; proximate causation of a medical injury; and damages."  *Id.*

(citing *Dingle v. Belin*, 749 A.2d 157, 164 (Md. 2000)).

#### i.  Absence of expert witness testimony

Defendant argues that it is entitled to summary judgment as to Count I because Plaintiff has

"declined to identify a medical expert to testify as to the standard of care during

discovery . . . [and] discovery has closed . . . ."  (ECF No. 55-1 at 13.)

Under Maryland law, physicians enjoy a presumption that they perform their medical duties

with the requisite skill and care.  *Nolan v. Dillon*, 276 A.2d 36, 46 (Md. 1971).  Further, the

Court recognizes that "[e]xpert witnesses play a pivotal role in medical malpractice actions in which plaintiffs bear the burden of demonstrating that the healthcare provider breached the requisite standard of care or skill and that such breach was a direct cause of the injury." *Rodriguez v. Clarke*, 926 A.2d 736, 755 (Md. 2007). As a result, "generally there must be produced expert testimony from which the trier of fact can determine the standard skill and care ordinarily exercised by a professional man of the kind involved in the geographical area involved and that the defendant failed to gratify these standards." *Crockett v. Crothers*, 285 A.2d 612, 614 (Md. 1972); *see also Rodriguez*, 926 A.2d at 755.

However, there exist "very rare" cases in which the breach of duty, injury, and causation are so obvious that expert testimony is not required. *Tucker v. University Specialty Hospital*, 887 A.2d 74, 78-79 (Md. App. 2005.) Admittedly, the present case does not perfectly fit the mold of such "obvious" cases. *See, e.g.*, *Thomas v. Corso*, 288 A.2d 379, 387 (holding that no expert testimony is required where a medical professional commits an "obviously negligent act such as accidentally amputating the wrong arm, or negligently leaving a sponge in the patient's body . . ." or "pull[ing] the wrong tooth . . .") Indeed, the present case involves complicated diagnoses where the "common knowledge or experience of lay[persons] is . . . [not] enough to recognize or infer negligence." *Id.* at 388; *see also Herbert v. United States*, No. WGC-07-2142, 2009 WL 3681677 at *16 (D. Md. Oct. 30, 2009) (granting summary judgment for the defendant in a medical malpractice case where plaintiff alleged that defendant-physician failed to notify her that she tested positive for hepatitis C in a timely fashion because plaintiff failed to present expert testimony regarding the standard of care as to a physician).

There is also another line of very rare cases in which no expert testimony is required because of an admission "of negligence or of lack of the skill ordinarily required for the performance of

the work undertaken." *Fink v. Steele*, 171 A. 49, 52 (Md. 1934).  Indeed, such an admission can

be sufficient to overcome the "presumption . . . that the physician, surgeon, or dentist has

performed the duty undertaken by him with reasonable care and skill." *Id.*  Defendant has

brought three cases to the Court's attention that discuss such admissions. *Fink*, 171 A. 49; *Hans

v. Franklin Square Hospital*, 347 A.2d 905, 908 n.4 (Md. App. 1975), *overruled on other

grounds by Brown v. Meda*, 537 A.2d 635, 642-43 (Md. App. 1988); *Bettigole v. Diener*, 124

A.2d 265, 266-67 (Md. 1956).  The Court finds the *Bettigole* case far less instructive than the

other two and will therefore omit it from the following discussion.

In *Fink*, a dentist filled a young girl's tooth.  *Fink*, 171 A. at 51.  About four months later, the

child's face was swollen.  *Id.* at 51-52.  The girl returned to the dentist who examined her and

determined that the filled tooth was the cause of the inflammation.  *Id.* at 52.  The dentist

immediately removed the tooth and explained that "he should have taken an x-ray before he

filled it." *Id.*  The Court found that there was no proof to overcome the presumption that "the

filling was carefully and skillfully done." *Id.*  Indeed, the Court found that the admission merely

showed that *at the time the tooth was removed* the dentist believed he should have taken an x-ray

before filling it.  *Id.*  The admission, in the Court's estimation, did not show that *at the time the

tooth was filled* "any condition existed from which trouble should have been expected by the

dentist from the mere []filling of the tooth without any treatment, x-ray, examination, or clinical

test." *Id.*

In *Hans*, a patient had "an operation on his lower anatomy (a hemorrhoidectomy) and awoke

to full consciousness with his right arm and hand paralyzed." *Hans*, 347 A.2d at 907.  A note in

the operating surgeon's office record read "ulnar nerve palsy-probably due to (operating) table

position with arm up over head." *Id.*  The Court found that this note fell "short of an

admission . . . from which negligence may be inferentially interpreted." *Id*. at 908 n.4.  Further, even if it were an admission, the Court continued, it was not legally sufficient evidence "that there was any want of reasonable care and skill by Dr. Sindelar, or that there existed *at the time of the operation* any symptoms or conditions from which the doctors might have anticipated any such results as followed." *Id.* (emphasis added).

The Court finds that the present case is at the intersection of these two lines of cases.  Indeed, the Court finds that the statements of both Dr. Mathew and Ms. Poteat are sufficient to establish that *at all relevant times* it *would have been* a breach of the standard of care for Dr. Mathew, who is not a specialist in infectious diseases, to diagnose a patient with a hepatitis C infection without first consulting with an infectious diseases specialist.  Indeed, both Dr. Mathew and Ms. Poteat have testified that a diagnosis of hepatitis C requires an infectious diseases specialist who has reviewed a patient's hepatitis C antibody testing and viral load testing.  (Mathew Depo. at 17, 21, 41-42, 47-48, 65; Poteat Depo. at 60-61.)   The Court finds that in light of these statements, no expert witness testimony is required to establish the standard of care.

In addition, even if expert testimony were required to establish the standard of care, the Court finds that the statements of Dr. Mathew and of Ms. Poteat constitute the requisite expert testimony.  Although Defendant argues that "Plaintiff cannot rely on vague hypothetical answers elicited from Dr. Mathew in her deposition to establish the  standard of care . . ." (ECF No. 62 at 8), the Court disagrees. Indeed, both Dr. Mathew and Ms. Poteat clearly testified that it *would have been* a breach of the standard of care for Dr. Mathew, who is not a specialist in infectious diseases, to diagnose a patient with a hepatitis C infection without first consulting with an infectious diseases specialist. (Mathew Depo. at 17, 21, 41-42, 47-48, 65; Poteat Depo. at 60-

61.)  Given the medical expertise of both Dr. Mathew and Ms. Poteat, the Court finds that their statements constitute expert testimony as to the standard of care.

The Court further finds that the question of whether or not Dr. Mathew *breached* this standard of care—that is whether or not Dr. Mathew did in fact diagnose Plaintiff with a reoccurrence of hepatitis C—is one that is so obvious that expert testimony is not required. *Tucker v. University Specialty Hospital*, 887 A.2d 74, 78-79 (Md. App. 2005).   Indeed, the factual dispute at the heart of this case is one that is squarely within the common knowledge or experience of a lay fact finder.   On the one hand, Plaintiff alleges that on January 7, 2011 Dr. Mathews told her that "based upon the blood work results [she] would need to go back on Interferon for reoccurrence of hepatitis C" and that she was "going to die." (Cantrel Aff. ¶ 4.) On the other hand, Plaintiff denies making any such statements.   (Mathew Depo. at 37.) Similarly, with regard to the events of January 21, 2011, Plaintiff alleges that Dr. Mathew told her that her pain "*was* due to hepatitis C."  (Cantrel Aff. at ¶ 6 (emphasis added).)  Dr. Mathew, for her part, recalls that she told Plaintiff that it was *possible* but *unlikely* that her abdominal pain was caused by a hepatitis C infection.   (Mathew Depo. at 38, 40; ECF No. 59-6 at 22 ("Abdominal pain may be caused by Hep C Infection.").)  The question for the fact finder is a simple one: who do you believe?  Answering such a question does not require the testimony of an expert witness.

In so finding, the Court recognizes that Defendant has put forth the statement of an expert witness who concluded that "Defendant Santhia A. Mathew MD provided medical care within the community standard of care for a Family Physician for the Plaintiff Jana Cantrell [sic]." (ECF No. 55-5.)  However, in arriving at this conclusion, Defendant's expert made numerous factual determinations regarding the veracity of Plaintiff's allegations.  In particular, Defendant's

expert did not give any credence to Plaintiff's allegations where they were at odds with Dr. Mathew's office visit notes or testimony. (*Id.* at ¶¶ 2, 3.) Crucially, therefore, the statement of Defendant's expert witness establishes that there was no breach of the standard of care *only* if one assumes that Plaintiff's recollection of the January 7 and January 21 office visits is wrong. The resolution of such a material issue of disputed fact is clearly the province of the fact finder and not of a party's expert witness.

The Court therefore finds that Defendant is not entitled to summary judgment as to Count I despite the fact that Plaintiff has "declined to identify a medical expert to testify as to the standard of care during discovery . . . [and] discovery has closed . . . ." (ECF No. 55-1 at 13.)

### ii. Denial of Plaintiff's life insurance application

As part of her claim under Count I, Plaintiff alleges that Defendant's negligence proximately caused State Farm to deny her life insurance application. Defendant seeks summary judgment as to this aspect of Count I. Although Defendant puts forth several arguments, the Court will focus on just one as it is dispositive of the issue. Specifically, Defendant offers that "Plaintiff cannot show proximate causation because State Farm would have denied her life insurance application independent of any conduct of Chase Brexton." (ECF No. 55-1 at 22.)

Here, Rebecca Ring, the underwriter who reviewed Plaintiff's life insurance application and made the final decision not to offer her a policy, explained that State Farm's guidelines provide that either (1) a "[h]istory of hepatitis C with abnormal liver function enzymes" or (2) a history of depression with poor control are cause for denial of a life insurance application. (Ring Depo. at 26-27.)

During her January 12, 2011 phone interview with State Farm, Plaintiff explained that in 2007 she was diagnosed with hepatitis C and followed a one-year interferon-based therapy.

(ECF No. 55-9 at 3.)  She also indicated that she had a liver function test with abnormal results on January 3, 2011.  (*Id.*)  It is undisputed that results of Plaintiff's blood work on January 3, 2011, showed that she had elevated "ALT" liver enzyme levels, as noted in Dr. Mathew's office notes.  (Mathew Depo. at 28; ECF no. 59-3 at 14.)  Further, also during her January 12 phone interview, Plaintiff provided that ever since her 2007-2008 hepatitis C diagnosis and treatment she suffered from depression.  (ECF No. 55-9 at 12-13.)  She explained that she felt this condition was poorly controlled.  (*Id.*)

On the basis of these undisputed facts, the Court finds that Plaintiff's life insurance application would have been denied for reasons independent of any conduct of Chase Brexton. Specifically, Plaintiff had a "[h]istory of hepatitis C with abnormal liver function enzymes" and a history of depression with poor control.  As Ms. Ring testified, each of these is an independent ground for denial of a life insurance policy application, per State Farm's guidelines.  (Ring Depo. at 26-27.)  As a result, Plaintiff is unable to establish proximate causation and Defendant's motion for summary judgment is granted as to Plaintiff's claim that Defendant's negligence proximately caused State Farm to deny her life insurance application.

### b.  Count II (IIED)

Plaintiff has alleged a claim of IIED based on two theories.  First, Plaintiff argues that "Dr. Mathew acted intentionally and/or recklessly when she told the Plaintiff the hepatitis C had returned and that she probably would need interferon treatment."  (ECF No. 59-1 at 27; ECF No. 23 at ¶ 23.)  Second, Plaintiff complains that "Chase Brexton through its employees informed State Farm Insurance Company that the Plaintiff had hepatitis C and that she suffered from a mental or nervous disorder was intentional and or /reckless."  (*Id.*)

Under state law, a claim of IIED has four elements: "(1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe." *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 113 (Md. 2000) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).   With regard to the second element, extreme and outrageous conduct is defined as conduct that "is 'so outrageous, and so extreme in degree, as to go beyond all possible bounds of decency, and to be granted as atrocious, and utterly intolerable in a civilized society.'" *Lasater v. Guttman*, 5 A. 3d 79, 89 (Md. App. 2010) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).

In the case at bar, even when viewing the facts and the inferences to be drawn therefrom in the light most favorable to Plaintiff, there is no plausible claim that any of the behavior at issue was "extreme or outrageous."

 The Court therefore grants Defendant's motion for summary judgment as to Count II.

## IV.    CONCLUSION

Accordingly, an order shall issue GRANTING IN PART and DENYING IN PART Defendant's motion for summary judgment.  (ECF No. 55.)


Dated this 12th day of August, 2014.

BY THE COURT:



_____/s/_____
James K. Bredar
United States District Judge

15